UNITED STATES DISTRICT COURT
WETERN DISTRICT OF NEW YORK

_____

CATHERINE A. LEISTEN,

                            Plaintiff,

                                                        Case No. 12-CV-6698-FPG

v.                                                       DECISION & ORDER

CAROLYN W. COLVIN,
Acting Commissioner of Social Security
Administration of the United States,

                            Defendant.

_____

## I.   INTRODUCTION

*Pro se* Plaintiff Catherine A. Leisten ("Plaintiff") brings this action pursuant to Title XVI of the Social Security Act ("SSA"), seeking review of the final decision of the Commissioner of Social Security ("Commissioner"), which denied her application for Supplemental Security Income ("SSI").  ECF No. 1.  The Court has jurisdiction over this matter under 42 U.S.C. §§ 405(g) and 1383(c)(3).

Before the Court, currently, are the Motions for Judgment on the Pleadings filed by both parties pursuant to Federal Rules of Civil Procedure 12(c).  ECF Nos. 7, 10.  For the reasons set forth herein below, I find that the final decision of the Commissioner is supported by substantial evidence within the record[1] and accords with applicable legal standards.  Therefore, this Court grants the Commissioner's Motion for Judgment on the Pleadings, denies Plaintiff's Motion for Judgment on the Pleadings, and orders that the Complaint be dismissed.

---

[1]All references to the Administrative Record are reflected herein as ("Tr."), along with the associated page number(s).

## II.   BACKGROUND

### A. Procedural History

Plaintiff initially applied for SSI on June 22, 2005, alleging disability due to bipolar disorder, depression, anxiety and post-traumatic stress disorder, with an onset date of December 31, 2004.  Tr. 36, 78.  Her application for SSI benefits was denied on October 28, 2005.  Tr. 53-55.  On May 21, 2008, Plaintiff, represented by her attorney Mark E. Maves, Esq., appeared at a video administrative hearing held before Administrative Law Judge ("ALJ") Newton Greenberg (Tr. 362-76), who on June 19, 2008, issued a decision finding that Plaintiff was not disabled.  Tr. 15-26.  The Appeals Council denied Plaintiff's request for review (Tr. 4-8).

Thereafter, Plaintiff commenced a civil action in the United States District Court for the Western District of New York, Docket No. 08-CV-6566-CJS, and on March 22, 2010, the Honorable Charles J. Siragusa remanded the claim for further administrative proceedings.  Tr. 462-84.  On remand, Plaintiff, this time represented by Jere B. Fletcher, Esq., appeared and testified at another administrative hearing, which took place on August 18, 2011 and was presided over by ALJ David S. Lewandowski ("ALJ").  Tr. 732-95.  Vocational Expert Peter A. Manzi, ("VE") appeared and testified, as well.  Tr. 776-82.  A friend of Plaintiff, Tammy Turnbull ("Turnbull") also appeared and testified on Plaintiff's behalf.  Tr. 784-94.  Following the completion of the hearing testimony, the ALJ, in accordance with Judge Siragusa's remand order directing development of the administrative record, held the record open until Sunday, September 18, 2008,[2] for additional evidence from Plaintiff's treating psychiatrist, Gloria J. Baciewicz, M.D. ("Dr. Baciewicz"), and from Gregory V. Seeger, M.D. ("Dr. Seeger") to determine if he treated Plaintiff during the relevant period.  Tr. 794-95.

---

[2] Pursuant to Fed. R. Civ. P. 6(a), the time period continued to run until the end of the day on Monday, September 19, 2008.

On November 21, 2011, the ALJ issued an unfavorable decision. Tr. 396-409. Noting that, upon a subsequent application filed on June 25, 2008, a different ALJ found Plaintiff disabled as of June 25, 2008 (Tr. 399; *see* Tr. 445-53), the ALJ considered only the remaining period between December 31, 2004, the date Plaintiff alleged her disability began, and June 24, 2008, the date before the established onset date of her disability, and found that Plaintiff was not disabled under Section 1614(a)(3)(A) of the SSA during this relevant time period. Tr. 409. The ALJ's decision became the final decision of the Commissioner on October 23, 2012, when the Appeals Council declined to assume jurisdiction. Tr. 377-79. Subsequently, Plaintiff timely commenced this action appealing the Commissioner's decision.

## B. Factual Background

Plaintiff, who first protectively applied for SSI benefits on June 22, 2005, was thirty-six years old at the time of the administrative hearing, and had completed the 11th grade, but was not in special education and never had vocational training. Tr. 407, 737. Her employment history included brief work as a hotel housekeeper, a supermarket cashier, a food preparer at a restaurant and food server at a movie theater. Tr. 78, 95-98, 369, 373-74, 738-39. Plaintiff has had four jobs in her lifetime for short periods of time in 1992, 1998, 1999 and 2000, with annual earnings never exceeding $1,990.00. Tr. 78. Plaintiff has not worked since August 2001 and stated that she has been unable to work since December 31, 2004. Tr. 78.

On a form completed by Plaintiff on July 24, 2005, she stated that her days were spent going to groups, mental health, visiting her children, going for walks and shopping. Tr. 85. Plaintiff stated that she took care of her own personal needs by preparing meals, doing household chores including laundry, dishes, dusting and vacuuming. Tr. 86-87. Preparing meals took about a half hour to 45 minutes. Tr. 86. She stated that she went outside every day, and traveled

by walking or using public transportation.  Tr. 87.  Plaintiff was able to drive, but her driver's license was suspended.  *Id.*  She stated that her hand shook because of her medication.  Tr. 89. She could walk continuously for 30 minutes, but needed to rest 10 minutes to continue walking. Tr. 90, 102.  Plaintiff's hobbies included watching movies and playing bingo, which she did weekly.  Tr. 88.  Plaintiff indicated that she tried to engage in social activities with others daily and to get along with family, friends, neighbors, or others, but that it depended, at times, on her mood, mental state or how she was feeling that day.  Tr. 89.  She did not have problems getting along with bosses, teachers, police, landlords or others in authority.  Tr. 90.  While alleging problems with paying attention, Plaintiff stated that she could follow spoken and written instructions and sometimes could do repetitive tasks.  Tr. 90, 370.  She also claimed that she experienced pain in her lower back from standing for long periods or walking long distances.  Tr. 92-93.  Plaintiff stated that her mental health caused some days to be better than others and sometimes made it hard to focus on things.  Tr. 102.

Plaintiff testified during a previous administrative hearing, held on May 21, 2008, that she could not work because sometimes anxiety overwhelmed her, she felt frustrated and would "sabotage" herself.  Tr. 367, 373-74.  She stated that she was interested in supporting herself, but her "mental gets in the way of [] feeling successful or wanting to complete something."  Tr. 369. Plaintiff admitted that her physical problems did not prevent her from working.  Tr. 365, 368. She testified that she lived with her two daughters, ages 12 and 13, and also has four sons who spend weekends with her.  Tr. 366, 370, 374-75.  She described her average daily activities as getting her daughters up for school, taking her medication, showering and dressing, attending an AA meeting or cleaning her house, or laying on the couch, depending on her mood.  Tr. 367, 370.  She stated that even on days when she went back to bed, she always got her daughters off to school.  Tr. 370.

During the administrative hearing held on August 18, 2011, Plaintiff testified that during the relevant period she was 5'7'' and weighed 210 pounds. Tr. 740-41. In 2005, she lived in a supportive living program at the YWCA, and moved in February 2007 to a house with her daughters. Tr. 742-43. Plaintiff testified that she had taken a variety of medications during this time period, including Ambien, Lamictal, Lithium, Buspar, Topamax, Risperdal, Abilify, Laxapro, Neurotonin, Seroquel, Trazadone, Vicodin (after a car accident in 2000) and Zoloft for "bipolar, depression, PTSD, anxiety and personality disorder." Tr. 743-44. Some of the side effects of these medications were sleepiness, eating more with weight gain, and not wanting to be around people. Tr. 745-46. Plaintiff testified that symptoms related to her disorders included feeling angry, being boisterous, unstable, feeling numb, anxiety, stress, drinking and using drugs, not knowing how to deal with her feelings, and isolating herself. Tr. 745-49. She stated that in 1998 and 1999 she was treating with Family Services, but went to Strong Recovery around 2002 and began seeing Dr. Baciewicz in 2003 or 2004 and, later, in 2007 or 2009, began treating with Dr. Seeger, her current psychiatrist.[3] Tr. 750-52. Plaintiff stated that her primary care physician was Dr. Dlugozima, but did not recall when she began seeing her. Tr. 752. She stated that she had also attended mental health classes at the Main Street IPRT program through Genesee Mental Health.[4] Tr. 754. Plaintiff testified that she had been arrested on more than one occasion 10 years ago. Tr. 756-57. Plaintiff stated that she "isolated," went to meetings, to group therapy, talked to therapists, took her medications, and took drugs and alcohol to make herself feel better during 2005-2008. Tr. 757-59.

Plaintiff acknowledged a long history of alcohol and drug abuse, but testified that she had been clean from alcohol and drug use since April 2007. Tr. 759, 765-66. She, again, stated that

---

[3] Plaintiff's representative stated at the hearing that the records indicated that Plaintiff began treatment with Dr. Seeger in May 2009. Tr. 752.
[4] IPRT records indicate that this program was under the auspices of Family Services of Rochester, Inc. Tr. 119-558.

her primary impairments were mental disorders, not exertional disorders, but her obesity was an aggravating factor. Tr. 740, 761-62. During the relevant period, Plaintiff was able to take care of her personal hygiene, dress herself, cook meals, shop for groceries and clothes, pay bills, and complete household chores, such as laundry, washing dishes, vacuuming, and dusting. Tr. 762-63, 766-67. Plaintiff testified that she would start something and come back later to finish it. Tr. 768. She visited and ate out with a friend with whom she also watched movies and cooked. Tr. 763-64. She participated in some of her daughters' school activities, and did not go to PTA. Tr. 764. Plaintiff also testified that she lived at two different locations with Tammy Turnbull, a friend of over 15 years, stating that they had good days and bad days. Tr. 760.

Plaintiff's friend of 15 years and with whom she lived on and off over the years, Tammy Turnbull, also testified during the August 18, 2011 administrative hearing regarding her observations of Plaintiff from June 2005 to June 2008. Tr.784-94. Ms. Turnbull, a recipient of SSI benefits, testified that her relationship with Plaintiff involved ups and downs and conversations where Plaintiff got agitated, upset, irritable, and defensive, thinking the conversation was about her when it wasn't, or that everything was about her. Tr. 786-87, 789. She stated that Plaintiff did not like to go out too often, so they watched movies together at her house and Plaintiff's house. Tr. 788. Ms. Turnbull stated that when cooking dinner, Plaintiff took a long time, about an hour, by starting and stopping, and when watching a movie, Plaintiff would leave the room and come back, or move around. Tr. 788, 793. She stated that Plaintiff used sticky notes to remember doctor appointments, but would not always remember, and if having a bad day, she would not go out and stay in bed all day. Tr. 790. Ms. Turnbull acknowledged that Plaintiff sometimes helped her two children with their homework, but got agitated if she didn't understand something, and Plaintiff also took care of their daily needs, fixed their meals and attended school celebrations, PTA days, and parent conferences. Tr. 791.

She stated that Plaintiff got her children up and motivated, but sometimes got into verbal and physical fights with them about going to school, and let them stay home. Tr. 792. Ms. Turnbull also testified that Plaintiff spent most of her time during the week in bed. Tr. 793.

Vocational Expert Peter Manzi ("VE") testified during the hearing regarding positions in the national economy that a hypothetical individual of claimant's age, education and work experience, who had an 11th grade education with no GED, no special education or vocational training, a light exertional restriction, the capability of understanding, remembering and carrying out simple instructions, performing simple unskilled tasks with only occasional interaction with the public and frequent interaction with coworkers, could perform. Tr. 776-77. The VE offered that the hypothetical individual could engage in three types of light, unskilled jobs in the national economy. Tr. 777. Upon questioning by Plaintiff's attorney, the VE acknowledged that for a hypothetical individual with functional limitations of being off task from reading, *e.g.*, 60 percent of the time and understanding instructions would preclude work. Tr. 781.

## C. Medical Evidence

On October 28, 1998, Plaintiff successfully completed a Chemical Dependency Program at the Family Services of Rochester, for alcohol and cocaine dependency. Tr. 106. Based upon the completion of her treatment goals and consistently passed urinalysis testing, the discharge summary indicated that Plaintiff's prognosis was good, with continued participation in AA/NA and recommended continued mental health counseling and attendance at the 12-Step meetings. *Id.* She was discharged from the Main Street IPRT program on December 18, 1998. Tr. 119. On July 6, 2004, Plaintiff entered "Strong Recovery," a mental health treatment program through Strong Memorial Hospital, with an intake diagnosis of cocaine dependence, opioid dependence, panic disorder, depression NOS, and a Hx Bipolar Disorder. Tr. 169-170. The self-discharge summary, dated November 18, 2004, indicated that Plaintiff attended several sessions with her

primary therapist, but stopped attending and eventually, was terminated from the program, with a discharge prognosis of "poor if she does not receive treatment." *Id.*

On November 30, 2004, treating physician Dr. Gloria J. Baciewicz, M.D., completed an "initial assessment" form for the Strong Recovery Chemical Dependency program to which Plaintiff had been referred by Monroe County Department of Social Services ("DSS") Welfare to Work program.  Tr. 211-13; repeated at Tr. 214-216.  Plaintiff's chief complaints presented at this initial assessment was the DSS referral and that she needed counseling to help her "stay focused each day and to help her talk about her feelings."  Tr. 211.  She stated that she had attempted treatment at Strong Recovery Chemical Dependency five times since 2002, was attending daily AA meetings, and described a long history of using alcohol and crack cocaine with some limited use of heroin.  Tr. 211, 212.  Plaintiff stated that she was arrested and jailed in October 2004 for prostitution.  Tr. 211.  She recounted a maternal family history of alcoholism, bipolar disorder, and depression.  Tr. 211.  She also reported childhood sexual abuse, and domestic violence.  *Id.*  Plaintiff stated that she had six children, a four-month-old in foster care and five others living with various family members.  Tr. 212.

Plaintiff stated that she attended MICA programs at St. Mary's and Strong Recovery, but denied a history of psychiatric treatment, suicide attempts or ideation.  Dr. Baciewicz noted that at her July 2004 intake, Plaintiff acknowledged overdosing on pills in 1992 due to relationship issues.  Tr. 213.

Upon the conduct of a mental status examination, Dr. Baciewicz observed that Plaintiff was cooperative, alert and fully oriented, and her speech was clear and productive.  *Id.* Plaintiff's mood was depressed, her judgment and insight were poor, and she evidenced some memory problems.  *Id.*  Plaintiff reported experiencing mood swings, daily panic attacks, "wacky

dreams," and past auditory hallucinations, but denied hallucinations and appeared neither suicidal nor homicidal. *Id.*

Dr. Baciewicz diagnosed cocaine dependence with physiological dependence, "[b]ipolar disorder per Catherine," rule out panic disorder, and rule out depressive disorder, and assessed Plaintiff's global assessment of functioning ("GAF") score as 47.[5] *Id.* She recommended that Plaintiff attend intensive evening treatment at Strong Recovery Chemical Dependency, but also noted that Plaintiff was unenthusiastic about treatment. *Id.*

At the Commissioner's request, Dr. Melvin Zax, a psychologist, conducted a consultative psychiatric evaluation of Plaintiff on September 28, 2005 (Tr. 180-83). Dr. Zax noted that Plaintiff never had to be hospitalized for a psychiatric problem. Tr. 180. Plaintiff reported that she had bipolar disorder, was anxious, depressed, moody, and felt low and sleepy. She said she sometimes felt overwhelmed, but could "talk herself out of it," and talking with her AA sponsor and her mother was helpful also. Tr. 181. Plaintiff also described a psychiatric history which included therapy and medications; a medical history which included obesity and vision problems; a long history of drug and alcohol abuse and some treatment; a legal history involving two arrests for prostitution and drug possession; and a limited work history. Tr. 180-181.

Regarding her daily activities, Plaintiff stated that she dressed and bathed herself, cooked, cleaned, did laundry and shopped. Tr. 182. She managed her own money, took buses, watched television, talked, and shopped with friends. *Id.* Plaintiff was close to her family. She attended

---

[5] Per n.6 of Defense Mem., ECF No. 7:

"The multiaxial scale assesses an individual's condition on five axes, each of which refers to a different class of information. Axis V refers to the individual's GAF, which is for reporting a clinician's judgment of an individual's overall level of functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 27, 32 (4th ed. text revision). A GAF of 41 to 50 reflects serious symptoms or any serious impairment in social or occupational functioning. *Id.* at 34."

group therapy, and kept appointments. *Id.* She got her children off to school, made them dinner and helped them with their homework. *Id.*

During the mental status examination, Dr. Zax observed that Plaintiff was cooperative, her manner of relating was adequate, and eye contact was appropriate. Tr. 181. Her gait, posture, and motor behavior were all normal. *Id.* Plaintiff's speech was fluent, voice quality was clear, both expressive and receptive language skills were adequate, her thinking was coherent, and her affect was appropriate. Tr. 181-82. Her mood was euthymic, her sensorium was clear, and she was oriented to person, place, and time. Tr. 182. Plaintiff's attention and concentration, as evidenced by doing serial threes with no errors in seven operations, and simple calculations in her head at average level, were intact. *Id.* Dr. Zax also determined that Plaintiff's recent and remote memory were intact based her recalling three out of three objects immediately and, again, after five minutes. *Id.* She also did only three digits forwards and two backwards. *Id.* Dr. Zax estimated that Plaintiff was intellectually, borderline, with her fund of information being appropriate to her experience, and her insight and judgment were fair. *Id.*

Dr. Zax, based upon his findings, indicated that he was "sure" Plaintiff could follow and understand simple directions. *Id.* His diagnosis was depressive disorder, mild; reflux; obesity; and visual problems. *Id.* Dr. Zax offered an opinion that Plaintiff seemed to have little or no interest in supporting herself. *Id.*

On September 29, 2005, Dr. Harbinder Toor, an internist, examined Plaintiff at the Commissioner's request. Tr. 184-87. Plaintiff's chief complaint was a history of lower back pain, reporting pain of 9 out of 10 on a scale of 1 to 10, and a history of mental illness. Tr. 184. She reported daily activities, including cooking, cleaning five times a week, laundry four times a week, shopping three times a week, childcare, showering, bathing, dressing herself, watching TV, reading, walking, going to movies, sitting outside and socializing with friends. Tr. 185.

Upon a physical examination, Dr. Toor noted that Plaintiff was 5'5" and weighed 271 pounds; her gait was normal, she could walk on her heels and toes without difficulty, squat fully, stand normally, and used no assistive devices.  *Id.*  Additionally, Plaintiff needed no help changing for the examination or getting on and off the examination table, and was able to rise from a chair without difficulty.   *Id.*   Her cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally, with no evidence of scoliosis, kyphosis or abnormality in the thoracic spine, mild curvature of the lumbar spine, and mild pain in the back. Tr. 186.   Deep tendon reflexes were physiologic and equal throughout, hand and finger dexterity were intact, and grip strength was 5/5 bilaterally; she had no motor or sensory deficit.  *Id.*  Dr. Toor opined that Plaintiff had a mild limitation for walking long distances, sitting and standing for a long time, lifting and bending.  Tr. 187.  An x-ray of the lumbosacral spine showed only mild narrowing of the disk space at L5-S1, with mild scoliosis.  Tr. 188.

On October 27, 2005, K. Kriner, a non-treating, non-examining agency review physician, indicated that Plaintiff had "no specific functional limitations." Tr. 192.

On November 16, 2005, Dr. Cheryl Butensky, Ph.D., a State agency psychological consultant, reviewed Plaintiff's records using the Psychiatric Review Technique form and found that Plaintiff had affective disorders, but did not have a severe mental impairment which equaled or met the listings.  Tr. 195-208.  Dr. Butensky assessed Plaintiff as having mild restrictions in her activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in concentration, persistence or pace; and never had repeated episodes of deterioration, each of extended duration.  Tr. 205.  Based on these assessments, she concluded that the evidence did not support any deficits in Plaintiff's ability to perform the full range of mental functioning activities.  Tr. 207.

On November 30, 2005, in a letter, Dr. Baciewicz stated that she had been Plaintiff's psychiatrist "for many years"[6] in conjunction with her treatment at Strong Recovery, and that the Plaintiff's diagnosis included bipolar disorder, panic disorder, and cocaine dependence, for which Plaintiff was taking medication and cooperating with group therapy. Tr. 210. Dr. Baciewicz stated: "In my opinion she remains unable to work at this time because of her mood and anxiety problems." *Id.*

Between November 2004 and December 2005, Plaintiff's weekly drug screening tests were negative. Tr. 232-67. However, Plaintiff relapsed into substance abuse in 2006. Tr. 277, 303. On February 14, 2006, she was discharged from the Strong Recovery Chemical Dependency program because she had returned to using drugs and was lost to contact. Tr. 303. Her past GAF score had been 65, but upon discharge, her GAF score was 50. *Id.*

Plaintiff resumed treatment at the Strong Recovery Chemical Dependency program on September 25, 2006, and successfully completed the treatment goals. Tr. 331-34. Upon discharge on December 27, 2007, Plaintiff's GAF was score 70.[7] Tr. 331. The discharge summary recommended further mental health services, including psychopharmacotherapy. *Id.* Plaintiff's prescriptions for Abilify, Buspar, Topomax, and Welbutrin, were continued. Tr. 333.

On May 23, 2008, Dr. Zito, affiliated with Monroe County's DSS, completed a review and found that Plaintiff's application for "medical assistance disability" should be approved,

---

[6] In his decision at n.3, Judge Siragusa questioned this reference since Dr. Baciewicz had completed an "initial assessment" form just one year earlier.
[7] Per n.7 of Def. Mem., ECF No. 7:

"A GAF of 61 to 70 signifies some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social or occupational functioning, but generally functioning pretty well, with some meaningful interpersonal relationships. DSM-IV-TR at 34."

with a disability onset date of November 1, 2007.  Tr. 622-23.  The approval was based on a "diagnosis of 12.04 Affective Disorders." *Id.*

On May 30, 2008, Anita McLeod, LMSW, a social worker at the Genesee Mental Health Center, examined Plaintiff at the suggestion of her primary care physician, Dr. Dlugozima, for treatment of her bipolar disorder.  Tr. 349-52.  Plaintiff complained of having "real highs" and "real lows," mood swings, isolating herself and having difficulty getting out of bed during her low periods, and during her high periods she would go on shopping and cleaning sprees, speak in a rambling manner, and stop taking her medication.  Tr. 349.  She alleged having difficulty sleeping, and experiencing racing thoughts, some anxiety, panic attacks and difficulty breathing Tr. 349, 351.  Plaintiff stated that she had tried several different medications for her "bipolar" and that Lithium and Seroquel "made her feel very high or drunk."  Tr. 349.  She denied having any physical pain.  *Id.*  She reported being clean and sober for thirteen months.  Tr. 350.  She did not have any apparent physical or intellectual limitations.  *Id.*  Plaintiff was concerned about her SSI and stated that she had a lawyer helping her to get benefits.  Tr. 349.

Upon conducting the mental status examination, Ms. McLeod noted that Plaintiff appeared on time for the session and was well groomed and cooperative.  Tr. 351.  Plaintiff's speech was  spontaneous, her thought processes were organized and thought content was goal oriented, although she reported continually racing thoughts.  Tr. 351.  She indicated that she was not depressed or anxious.  *Id.*  Plaintiff       had some negative rumination, but had no paranoia or delusions, and was not suicidal or homicidal.  *Id.*  Her mood was full range, her affect was congruent, and her orientation was full.  *Id.*  Memory, both remote and recent, was intact.  *Id.*  Plaintiff's insight was poor, her impulse control was good, and her judgment and concentration were fair.  *Id.*  Ms. McLeod's diagnosis[8] was 296.80 bipolar disorder unspecified, cocaine

---

[8] As Judge Siragusa observed:

dependence in sustained full remission, and rule out 304.83 borderline personality disorder. *Id.* Plaintiff's GAF was 55. *Id.*

On June 13, 2008, Plaintiff saw Ms. McLeod for a follow-up session. Upon the mental status examination, Ms. McLeod noted that Plaintiff was well groomed, cooperative and fully oriented. Tr. 616. Plaintiff had racing thoughts and negative ruminations and her mood was depressed and anxious. *Id.* Her insight and judgment were poor, but her speech was spontaneous, her affect was congruent, remote and recent memory was intact, concentration was fair, and impulse control was good. *Id.*

During the period at issue, Plaintiff also saw her primary care physician, Dr. Maureen Dlugozima of Rochester General Hospital, for various ailments and medical issues, such as sinus infections, upper respiratory infections, sore throat, rashes, MRSA and abdominal concerns. Tr. 269-96, 626-639, 679-80. Plaintiff also sought treatment from other doctors for other illnesses, annual gynecological exams and testing, recurring postules. Tr. 572-73, 582-83, 600-03.

On July 1, 2008,[9] Plaintiff met with Dr. Gregory V. Seeger, M.D., of Genesee Mental Health Center, for a "Medication Review." Tr. 353-54. He noted that Plaintiff was quite obese, but reported her appetite as stable and that she was sleeping well at night. Tr. 353. She reported having "psychotic symptoms despite being on the maximum dose of Abilify, hearing voices and experiencing some mild mood swings with anxiety at times. Dr. Seeger found that Plaintiff was alert, oriented and cooperative, with no paranoia or thought disorder, was not depressed or suicidal and her judgment was good. *Id.* His impression was bipolar disorder, cocaine dependence in remission, borderline personality disorder, and obesity. *Id.* He recommended no

---

"As a clinical social worker, McLeod is not an 'acceptable medical source' for purposes of establishing an impairment. 20 C.F.R. § 404.1513(a). However, her opinion may be considered to show the severity of an impairment and how it affects Plaintiff's ability to work. 20 C.F.R. § 404.1513(d)(1)." ECF No. 15, n.4.

[9] Plaintiff's visit with Dr. Seeger and the follow-up visits with him were outside the relevant period and occurred after the date of disability.

change in Lamictal, Welbutrin or BuSpar, but decreased the daily Abilify dosage from 30 mg to 15 mg, and prescribed a trial of Geodon. *Id.* at 354.

Plaintiff saw Dr. Seeger again on September 5, 2008 for a "Medication Review." Tr. 355-56. Dr. Seeger noted that Plaintiff was doing well on Geodon and still had some mild mood swings, but, generally, her mood was relatively stable. Tr. 355. She had also lost 10 pounds since the last visit. *Id.* Plaintiff was alert, oriented and cooperative, with good affect, and did not appear depressed. *Id.* There were no signs of thought disorder or paranoia, but Plaintiff still claimed to hear voices "episodically." *Id.* His impression was bipolar disorder, cocaine dependence in remission, borderline personality disorder. *Id.* Dr. Seeger reduced the daily Abilify dosage to 10 mg and increased her Geodon dosage. *Id.*

On October 22, 2008, Dr. Seeger completed a Substance Abuse Supplemental Questionnaire. Tr. 359-60, repeated at Tr. 682-83. He stated that Plaintiff's alcohol and drug abuse was in sustained full remission for 18 months, and that Plaintiff did not suffer from a substance-induced anxiety disorder or a substance induced mental health disorder. Tr. 359. He diagnosed Plaintiff as having "296.80 Bi-Polar D.O., unspecified," noting that she had been reasonably compliant with treatment. *Id.* Dr. Seeger indicated that Plaintiff's impairments significantly and seriously interfered with her ability, on a sustained basis, to perform in the competitive work setting, even if she ended inappropriate involvement with substances. *Id.* at 360. Dr. Seeger stated that Plaintiff "has a pattern of inner experience and behavior that is enduring, inflexible, and maladaptive in social settings such as the competitive workplace," that stress would negatively impair her behavior and functioning, and that she" may be able to function in some areas but still experience serious or marked impairment in other areas unrelated to substance abuse or dependency." *Id.* He indicated that Plaintiff may commonly self-medicate with alcohol or street drugs. *Id.*

## III.   DISCUSSION

### A.  Scope of Review

On appeal, this Court's role is to determine "if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see also* Title 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ...."). It is not this Court's function to "determine *de novo* whether the [plaintiff] is disabled." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (citation omitted). "Substantial evidence means 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Burgess v. Astrue*, 537 F.3d 117, 127-128 (2d Cir. 2008) (citing *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

### B.  Fed. R. Civ. P. 12(c) Standard

Rule 12(c) permits a party to move for judgment on the pleadings "after the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). Thus, in deciding a Rule 12(c) motion, a court employs the same standard applicable to dismissals pursuant to Fed. R. Civ. P. 12(b)(6). *Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009) (per curiam). A court must accept as true all of the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *Id.* To withstand a motion for judgment on the pleadings, a court must determine whether the "'well-pleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* at 161 (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). Thus, granting judgment on the pleadings is only appropriate when, after reviewing the record, the court is convinced that the

16

Plaintiff has failed to set forth a plausible claim for the requested relief based on the evidence presented. *See generally Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

### C. Standard for Eligibility for SSI

The SSA provides that an individual shall be considered disabled if he or she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). An individual will be determined to be disabled only upon a demonstration that his or her physical impairment(s) are of such severity as to preclude him or her from not only performing his or her previous work but, considering his or her age, education, and work experience, from engaging in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

In determining whether an individual is disabled, using this definition, the Commissioner must engage in the SSA-created five-step sequential evaluation process outlined in 20 C.F.R. § 416.920. The Commissioner must consider, in order: (1) the individual's work activity (20 C.F.R. § 416.920(a)(4)(i)); (2) the medical severity of the impairment(s) and that it meets the duration requirement in § 416.909 (20 C.F.R. § 416.920(a)(4)(ii)); (3) the medical severity of the impairment(s) and that it meets or equals the listings criteria in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(a)(4)(iii)); (4) an assessment of the individual's residual functional capacity and past relevant wok history (20 C.F.R. § 416.920(a)(4)(iv)); and (5) an assessment of the individual's residual functional capacity and age, education, and work experience to see whether he or she can make an adjustment to any other type of work (20 C.F.R. § 416.920(a)(4)(v)).

The required analysis is as follows:

17

First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. pt. 404, subpt. P, app. 1. If the claimant has a listed impairment, the Commissioner will consider the claimant disabled without considering vocational factors such as age, education, and work experience; the Commissioner presumes that a claimant who is afflicted with a listed impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

*Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999). The claimant bears the general burden of proving that he or she has a disability at steps one through four of the sequential five-step process, *Butts v. Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004), and only when the claimant proves that he or she cannot return to his or her prior work, at step five, does the burden shift to the Commissioner to prove the existence of alternative substantial gainful work in significant numbers in the national economy which claimant can perform, considering his or her physical and mental capabilities, age, education, experience and training. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).

Plaintiff maintains that the final decision of the Commissioner should be reversed for the following reasons: the ALJ committed legal errors, failed to apply the treating physician rule and "mis-evaluated" the legal evidence. Plaintiff's Memorandum of Law in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings and in Opposition to Defendant ("Pl.'s Mem.") (ECF No. 10-1). I disagree, and find that the Commissioner's determination should be affirmed.

### D. The ALJ's Decision

The ALJ followed the sequential five-step analysis for evaluating Plaintiff's claim of disability. Tr. 401. At step one, the ALJ found that Plaintiff had not engaged in substantial

gainful activity since June 25, 2005, the application date (20 C.F.R. 416.971 *et seq*). *Id.* At step two, he found that Plaintiff had the following severe impairments: cocaine dependence; bipolar disorder by history; depressive disorder; back pain; and obesity (20 C.F.R. § 416.920(c)). *Id.* At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926). Tr. 402-03. The ALJ, after careful consideration of the record, at step four, concluded that Plaintiff had the residual functional capacity to perform light work[10] with limitations, including: that she was only capable of understanding, remembering, and carrying out simple instructions, performing simple unskilled tasks; occasional interaction with the public; and frequent interactions with coworkers. Tr. 403-407. Also, at step four, the ALJ found that Plaintiff had no past relevant work. Tr. 407. Considering Plaintiff's age, education, work experience, and residual functional capacity, at step five, the ALJ found that there were jobs that exist in significant numbers in the national economy that Plaintiff could perform; specifically, photocopy machine operator, collator operator, and laundry sorter. Tr. 408-409. Accordingly, he concluded that Plaintiff had not been under a disability, as defined in § 1614(a)(3)(A) of the SSA, since June 22, 2005, the date the application was filed. Tr. 409.

## E. The Commissioner Applied the Correct Legal Standards

Plaintiff contends that the Commissioner failed to apply the correct legal standards in arriving at the decision that she was not disabled. However, upon review and as discussed herein

---

[10] As defined in 20 C.F.R. § 416.967(b),

> light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

below, there is nothing to support Plaintiff's contention.   First, there is no doubt that the Commissioner applied the correct legal standards by engaging in the SSA-created five-step sequential evaluation process outlined in 20 C.F.R. § 416.920.   Second, the Commissioner utilized the proper legal standard in weighing the opinions of her treating physicians.   Third, because substantial evidence supported the Commissioner's decision, I disagree with Plaintiff's assertion that the ALJ failed to properly apply SSR 83-20,[11] to give her the benefit of looking back before the June 2008 decision that found her to be disabled.

### F.  The Commissioner gave Proper Weight to the Treating Physician's Findings

Plaintiff contends that the ALJ improperly discounted the opinion of her treating physicians, Dr. Baciewicz, her treating psychiatrist at Strong Recovery, and Dr. Seeger, her current psychiatrist, who knew her best, had a longer treating relationship with her, and whose opinions were consistent with and supported by her medical records and her medical prescriptions.   I, respectfully, disagree.

The treating physician rule provides that an ALJ should defer "to the views of the treating physician who has engaged in the primary treatment of the claimant."   *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).   A treating physician's opinion as to the nature and

---

[11]The particular portions of SSR 83-20, upon which Plaintiff relies, state respectively, in relevant part that:

*2  at 3.  Medical and Other Evidence

With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling…. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomology of the disease process.

…

*3 In determining the date of onset of disability, the date alleged by the individual should be used if it is consistent with all the evidence available.

severity of a claimant's impairment is given controlling weight by the Commissioner, if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record." 20 C.F.R. § 404.1527(c)(2); SSR 96-2P; *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). However, "[a] treating physician's statement that the claimant is disabled cannot itself be determinative." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999).

The role of the Commissioner is to resolve "genuine conflicts in the medical evidence." *Burgess*, 537 F.3d at 128. The ALJ must "comprehensively set forth the reasons for the weight assigned to the treating physician's opinion." *Id.* at 129. Before refusing to accord controlling weight to a treating physician's medical opinion, the ALJ must consider several factors in determining how much weight to give the opinion, including: (1) frequency of examination and length of the treatment relationship; (2) evidence supporting the treating physician's opinion; (3) consistency of the opinion with the record as a whole; (4) specialization of the treating physician; and (5) other factors brought to the SSA's attention which tend to support or contradict the treating physician's opinion. 20 C.F.R. § 404.1527(c)(1-6); *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

The ALJ considered, but did not give controlling weight to Dr. Baciewicz's opinions, and specifically explained his reasons for not doing so. Tr. 406. First, the ALJ carefully reviewed the brief letter dated November 30, 2005, submitted by Dr. Baciewicz in which she stated the following: (1) she had been claimant's psychiatrist for many years at Strong Recovery; (2) claimant was on medication and attending group treatment; and (3) the claimant was unable to work because of "mood and anxiety problems" *Id.* He observed that at the time of intake to the Strong Recovery program, Dr. Baciewicz diagnosed claimant with Cocaine dependence, with psychological dependence; Bipolar disorder, per patient; Rule out Panic disorder; Rule out

Depressive disorder, NOS. *Id.*; Tr. 213. The ALJ stated that in making such diagnosis, Dr. Baciewicz apparently heavily relied on the subjective report of past diagnosis provided by the claimant, and there was no evidence that Dr. Baciewicz "used acceptable clinical and laboratory diagnostic techniques" to diagnose the claimant. *Id.*

The ALJ also compared Dr. Baciewicz's statement regarding the length of time she was claimant's psychiatrist at Strong Recovery, *i.e.*, "many years," with the medical records and found that the first record with Dr. Baciewicz's signature was dated November 2004, and the only other records, Treatment Plan Reviews, were co-signed by her on three occasions in 2005, and once both in 2006 and 2007. *Id.* Evaluating the letter further, the ALJ observed that it was conclusory, failed to list diagnosis, medications, signs or symptoms of impairments, and analysis regarding functional limitations. *Id.* I agree, and find that the ALJ reasonably attributed proper weight to Dr. Baciewicz's opinion, expressed in the letter, that Plaintiff was unable to work due to "mood and anxiety problems," because it was neither determinative of disability, *Snell v. Apfel*, 177 F.3d at 133, nor supported by a diagnosis obtained by using "acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1527(c)(2); SSR 96-2P; *Burgess v. Astrue*, 537 F.3d at 128.

Second, the ALJ noted his unsuccessful attempts to supplement the record and fill in the gaps in the administrative record, as required on remand. Tr. 406. The ALJ specifically indicated that no response was received to a letter sent to Dr. Baciewicz on September 7, 2011 requesting information required by the district court. Moreover, the claimant's representative notified the ALJ by letter dated September 15, 2011, that he contacted Dr. Baciewicz twice in August and once in September with no response. Tr. 406. It is well-settled that "an ALJ cannot reject a treating physician's diagnosis without first attempting to fill any gaps in the administrative record. In fact, where there are deficiencies in the record, an ALJ is under an

affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel." *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (citations and quotation marks omitted).   However, the ALJ was not required to make further attempts to contact Dr. Baciewicz. 20 C.F.R. § 416.912(e)(2); *see, e.g., Rebull v. Massanari*, 240 F. Supp. 2d 265, 273 (S.D.N.Y. 2002) (ALJ did not need to re-contact the treating physician whose opinion was unsupported).   Here, the ALJ fully complied with the district court's directive on remand, and affirmatively met his obligation to develop the Plaintiff's medical history, albeit without success in obtaining the requested medical information from Dr. Baciewicz.

The ALJ, likewise, afforded little weight to the opinion of Dr. Seeger, who diagnosed claimant with bipolar disorder, NOS and stated that she would not be able to work on a sustained basis, finding that Dr. Seeger did not treat the Plaintiff during the relevant period.   Tr. 406. Moreover, despite the ALJ's attempts to supplement the record by sending two letters, one on September 7, 2011 and a follow-up "second request," to Dr. Seeger requesting information about Plaintiff's "dates of treatment, diagnosis, medications and their affect, signs or symptoms of impairments, and any limitations that would affect her ability to function," no response from Dr. Seeger was forthcoming.   Tr. 406-7.   Additionally, the ALJ noted that the claimant's representative stated by letter that he twice contacted Dr. Seeger with no response.   *Id.* Regarding Dr. Seeger, the ALJ fully complied with the district court's directive on remand and affirmatively met his obligation to develop the Plaintiff's medical history, albeit without success in obtaining the requested medical information from him.

On the other hand, the ALJ afforded substantial weight to the opinions of consultative examiners, non-treating sources Drs. Toor and Zax based on (1) their examinations of claimant on September 9, 2005 using acceptable diagnostic techniques and clinical practices; and (2) the consistency of their findings and opinions with the overall medical record. Tr.407.   Specifically,

the ALJ found that Dr. Toor's estimation that Plaintiff would have mild limitations for physical activities such as walking, sitting or standing for long periods of time and heavy lifting, was based upon an examination which was unremarkable and within normal limits for all body systems, with the exception of mildly limited range of motion of the lumbar spine and slightly positive straight leg raising with mild pain. *Id.* The supporting examination record indicated that Plaintiff was 5'5" and weighed 271 pounds; her gait was normal, she could walk on her heels and toes without difficulty, squat fully, stand normally, and used no assistive devices; she needed no help changing for the examination or getting on and off the examination table, and was able to rise from a chair without difficulty; her cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally, with no evidence of scoliosis, kyphosis or abnormality in the thoracic spine, though mild curvature of the lumbar spine and mild pain in the back; deep tendon reflexes were physiologic and equal throughout, hand and finger dexterity were intact, and grip strength was 5/5 bilaterally; she had no motor or sensory deficit. Tr. 185-86.

According to the ALJ, Dr. Zax's examination revealed that despite very little work experience, Plaintiff could follow and understand at least simple directions based upon a diagnosis of mild depressive disorder, and exam results which were only partially consistent with Plaintiff's allegations. *Id.* The record of Dr. Zax's examination indicated that Plaintiff's attention and concentration, as evidenced by doing serial threes with no errors in seven operations, and simple calculations in her head at average level, were intact; her recent and remote memory were intact based on her recalling three out of three objects immediately and, again, after five minutes; and she also did only three digits forwards and two backwards. Tr. 182.

The opinion of a consultative examiner can constitute substantial evidence supporting an ALJ's decision. *See Diaz v. Shalala*, 59 F.3d 307, 315 (2d Cir. 1995). The report of a consultative physician who examines the Plaintiff and reaches conclusions based upon a one-time examination may constitute substantial evidence in support of the ALJ's decision. *Monguer v. Heckler*, 722 F.3d at 1039. Here, the record reflected the inconsistency of Dr. Baciewicz's unsupported opinion that Plaintiff was unable to work, as contrasted with the opinions of Drs. Toor and Zax who found only mild limitations. Moreover, Dr. Seeger never stated in his October 2008 substance abuse supplemental questionnaire that the limitations mentioned therein existed prior to the time he first saw Plaintiff on July 1, 2008. Even though Plaintiff does not appear to rely on the May 23, 2008 physician-signed report of the Monroe County DSS finding her disabled based upon a diagnosis of an affective disorder and a very brief description of medical findings, it is worth noting that the ALJ found that there was no attached medical documentation, and the opinion was unsupported, thereby, not deserving any significant weight. Tr. 407.

The ALJ afforded persuasive weight to State Agency sources, K. Kriner and Dr. Butensky who, as "expert opinion evidence of non-examining sources" pursuant to SSR 96-6p, indicated that Plaintiff was capable of medium work and was not significantly restricted by mental limitations based on findings that were consistent with the record, which included the opinions, test results and clinical findings from examining sources. Tr. 407. K. Kriner indicated that Plaintiff had "no specific functional limitations." Tr. 192. Based upon her assessments of Plaintiff as having mild restrictions in her activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in concentration, persistence or pace; and no repeated episodes of deterioration of extended duration, Dr. Butensky concluded that the evidence did not support any deficits in Plaintiff's ability to perform the full range of mental

functioning activities.  Tr. 205-207.   In view of the consistency of the opinions of State Agency examiners K. Kriner and Dr. Butensky with the consultative examiners Drs. Toor and Zax, the ALJ was justified in considering, but affording little weight to, the opinions of treating physicians Baciewicz and Seeger regarding Plaintiff's disability.

Therefore, I agree with the Commissioner that the ALJ's decision not to give the opinions of Plaintiff's treating physicians controlling weight did not constitute reversible error.

### G.  Substantial Evidence Supported the Commissioner's Decision

Plaintiff claims the ALJ mis-evaluated the evidence regarding "multiple non-exertional, health impairments, that include a significant history of mental health problems (t. 77-81, 91 all from 2005, 337), plus physical problems, with pains and limitations (for example, T. 102, and 740 hearing)."  Plaintiff does not argue against the ALJ's findings that she had no past relevant work experience and that she suffered from the following severe impairments: cocaine dependence; bipolar disorder by history; depressive disorder; back pain; and obesity, but complains instead that he failed to consider the severity of these impairments.  I find that the ALJ based his decision that the Plaintiff was not disabled upon a record which contained substantial evidence to support the decision.

Contrary to Plaintiff's contentions, The ALJ clearly reviewed and considered all available evidence in reaching his decision, including incorporation and reference to the discussion set forth in the June 19, 2008 decision.  Tr.  401.  In so doing, he found that Plaintiff had been in a number of substance abuse treatment programs, but specifically complained of low back pain, obesity and stomach problems, though, at the hearing, her representative stated that her mental health was the primary inability to work and her obesity "aggravated" the non-exertional impairments.  Tr. 401-02.  The ALJ, preliminarily, reviewed Plaintiff's mental health history and the alleged aggravating factors, notably that (1) on August 14, 1997, a social worker reported

Plaintiff has diagnoses of depressive disorder and personality disorder, but did not have a psychiatrist; (2) Plaintiff reported in a gynecological record of July 2, 2004 that she was not on any medication for bipolar disorder; (3) a September 19, 2004 substance abuse treatment program discharge report stated that Plaintiff was diagnosed with cocaine dependence; rule out opioid dependence; rule out panic disorder; rule out depression; history of bipolar; (4) in October 24, 2006, Plaintiff reported to her primary doctor that she was attending the MICA program at Strong Recovery for bipolar, posttraumatic stress disorder (PTSD) and anxiety, but the Strong Recovery assessment stated that she was diagnosed with cocaine dependence; bipolar disorder, per Plaintiff; rule out panic disorder; rule out depressive disorder; (5) in July 2008, after the period in question, Dr. Gregory Seeger, M.D. diagnosed Plaintiff with bipolar disorder at the initial visit with him; (6) though reporting that she was 5'7" and weighed 210 pounds on her application, Plaintiff did not testify to any limitations caused by her weight and a 2005 x-ray of lumbosacral spine showed moderate narrowing of the disk space at the L5-S1 level and mild scoliosis; and (7) Plaintiff's primary care physician Dr. Maureen Dlugozima, M.D., never submitted any reports of any functional limitations during the relevant period. *Id.*

In determining that Plaintiff's severe mental impairments, singly or in combination, did not meet or medically equal the criteria of listing 12.04, the ALJ evaluated them according to the criteria set forth in "paragraphs B and C." Tr. 402. As the ALJ stated, "paragraph B" required that the mental impairment must result in two of the following: marked restriction of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration. The ALJ noted that "marked limitation" means "more than moderate but less than extreme," and "repeated episodes of decompensation, each of extended duration" means "three

episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."

*Id.* The ALJ described the criteria in "paragraph C" as requiring the following:

> A medically documented history of chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychological support resulting in at [least] one of the following: repeated episodes of decompensation; a residual disease process that has results in such marginal adjustment that even a minimal increase in mental demands or change in environment would be predicted to [cause] the individual to decompensate; or current history of one or more years' inability to function outside a highly supportive living arrangement.

Using these criteria to evaluate the record regarding Plaintiff's mental impairments, the ALJ considered that Plaintiff had mild restriction in daily living activities: daily she went out for walks or group meetings; was able to maintain her hygiene; perform all apartment chores, which included laundry, dishes, cleaning, dusting, vacuuming, and fixing meals; and do her own shopping. *Id.* Citing her mild difficulties in social functioning, the ALJ stated that when applying for disability benefits, Plaintiff reported visiting her children at their homes; occasionally visited a friend to watch movies and cook; and according to her testimony at the hearing, Plaintiff helped her children with their homework, talked on the phone with their teachers and went to some school activities. *Id.* The ALJ noted moderate difficulties regarding concentration, persistence or pace, specifically, stating the following: Plaintiff needed to use post-it-notes around the apartment as reminders to take her medication; she reported watching movies at her friend's house but would get up and come back to it; on the functional report, without elaboration, Plaintiff simply checked that she had trouble remembering things; at the hearing she testified to beginning a task and coming back to it a couple of hours later; and she did not read because she could not stay focused long enough and gets frustrated. Tr. 402-03. The ALJ found that Plaintiff had experienced no episode of decompensation that was of extended duration. Reasoning that Plaintiff's mental impairments did not cause at least two

"marked" limitation and "repeated" episodes of decompensation, each of extended duration, the ALJ concluded that the criteria in "paragraph B" had not been met. Tr. 403.

In determining that the "paragraph C," had not been met either, the ALJ considered Plaintiff's reporting at the time of her application that she was in supportive living; that Plaintiff had been referred by Strong Recovery to the YWCA residence program in hopes that it would help her chances of success in treatment; that Plaintiff's hearing testimony that she resided at the YWCA until February 2007, but her therapist stated in February 2006 that Plaintiff had lost housing at the YWCA. *Id.* The ALJ, additionally, considered Plaintiff's self-report of a suicide attempt in 1992 or 1993 by an alleged overdose on drugs. *Id.*

The ALJ, next, undertook a Residual Functional Capacity ("RFC") assessment pursuant to SSR 96-8p, which reflected the degree of limitation found in the "paragraph B" mental function analysis, taking care to note that the limitations identified in "paragraph B" were used to rate the severity of Plaintiff's mental impairments. *Id.* Analyzing the entire record, the ALJ determined that Plaintiff had an RFC to perform light work, but with the following limitations: she was only capable of understanding, remembering, and carrying out simple instructions, performing simple unskilled tasks; occasional interaction with the public; and frequent interactions with coworkers. *Id.*

In making this RFC determination, the ALJ acknowledged that the record contained evidence indicating that Plaintiff had been in numerous substance abuse treatment programs where she had received psychiatric treatment and medications, namely, chemical dependency programs at Park Ridge Chemical Dependency, Liddis Center, Family Services of Rochester, YWCA programs, St. Mary's and Strong Recovery Chemical Dependency program. Tr. 404. She was treated by Dr. Baciewicz, at Strong Recovery at the time of her application, having been referred to treatment by Monroe County DSS' Welfare to Work program. *Id.* Plaintiff, at the

time of intake, was diagnosed with cocaine dependence; bipolar disorder per Plaintiff; rule out panic disorder; and rule out depressive disorder.   In February 2006, Plaintiff was discharged from the program due to loss of contact and substance abuse, but re-engaged in the program in October 2006 and participated until discharged in December 2007 with a diagnosis of cocaine dependence, early full remission; alcohol dependence, early full emission; bipolar disorder, type II; and a GAF score of 70.  *Id.*  Discharge, this time, was the result of Plaintiff having met all treatment goals and stability on her medications, and included a recommendation that Plaintiff establish mental health care. *Id.*

The ALJ stated that there was no evidence that Plaintiff established mental health care until she met with Licensed Social Worker McLeod on May 30, 2008, for a psychosocial assessment, a week after her hearing before ALJ Greenberg; Plaintiff did report at that visit that she had been clean from substance abuse for about 13 months.  Tr. 405.  It wasn't until July 1, 2008, however, that Plaintiff met with Dr. Seeger, whose stated impression after this initial meeting was bipolar disorder; cocaine dependence in full remission; and a borderline personality disorder. *Id.*  Subsequently, at the request of Plaintiff's attorney of record, Dr. Seeger, on October 22, 2008, again after the relevant period, completed a substance abuse supplemental questionnaire. *Id.*

The ALJ also reviewed the September 2005 record of consultative examiner Dr. Zax, noting that it included Dr. Zax's finding that Plaintiff's mental status was within normal limits, but his estimation of Plaintiff's intellectual functioning as borderline was not based on the performance of any formal intelligence testing or corroborated by other evidence in the record. *Id.*  Dr. Zax's findings were that Plaintiff's attention and concentration were intact, as were recent and remote memory; his diagnosis was mild depressive disorder. *Id.*

The ALJ also considered Dr. Toor's September 2005 record of his examination of Plaintiff, during which she reported experiencing back pain of 9 out of 10 on a scale of 1 to 10. *Id.* According to the ALJ, Dr. Toor observed that Plaintiff could ambulate effectively, her hand and finger dexterity were intact, though an x-ray of the lumbosacral showed moderate narrowing of the disk space at L5-S1, with mild scoliosis. Otherwise, the exam was unremarkable and within normal limits for all body systems, except for mildly limited range of motion of the lumbar spine, and slightly positive leg raising with mild pain. *Id.*

Although records disclosed that Plaintiff sought treatment by treating physician Dr. Dlugozima for various acute illnesses, annual gynecology exams, and recurrent pustules, none of the records showed that Dlugozima treated Plaintiff for back pain or a mental health disorder, all leading the ALJ to find that if Plaintiff was experiencing the level of severe back pain reported to Dr. Toor, she would be expected to report the same to her treating physicians. Yet, back pain was not brought to the attention of any provider and Tylenol was the only medication Plaintiff reported taking for back pain. *Id.*

Further assessing Plaintiff's RFC, the ALJ evaluated Plaintiff's alleged medication history as provided by her and her representative, finding that Plaintiff never reported that she was on Vicodin during the relevant period nor was there evidence that it was ever prescribed. *Id.* He also found that Plaintiff testified during the hearing that "some" of the medications made her sleepy and "some" made her eat more (eating comfort foods made her feel good), and on her application she did report that her medications made her shake; yet, there was no evidence in the records, until May 30, 2008, which demonstrated that Plaintiff reported medication side effects to her doctors. *Id.*

It is the role of the Commissioner, not the reviewing court, "to resolve evidentiary conflicts and to appraise the credibility of the witnesses," including with regard to the severity of

a claimant's symptoms. *Carroll v. Secr'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).   Social Security regulations require Administrative Law Judges to follow a two-step process for evaluating pain and other limiting effects of symptoms.  20 C.F.R. §§ 404.1529(a), 416.929(c)(3).   First, the ALJ must determine whether the objective medical evidence, *i.e.*, medical signs and laboratory findings, and other evidence shows that a claimant suffers from a medically determinable impairment which could reasonably be expected to produce the claimant's symptoms.   If the claimant does suffer from an impairment, the ALJ must then evaluate the intensity, persistence, or limiting effects of the claimant's symptoms to determine the extent to which the symptoms limit the claimant's ability to work.   20 C.F.R. § 416.929(c)(1).  When doing do, the ALJ must consider all of the available evidence, including the claimant's medical history, medical signs and laboratory findings, and statements from the claimant, the claimant's treating source and other medical opinions, or other persons about how the symptoms affect the claimant.  *Id.*

If a claimant's statements about his or her symptoms are not supported by the objective medical evidence, *i.e.*, suggest a higher level of severity than shown by the medical evidence, the ALJ must consider the other evidence and make a credibility assessment based upon the following factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms;  (3) precipitating and aggravating factors;  (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment to relieve symptoms; (6) any measures taken by claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  The ALJ's decision must set forth "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the [claimant] and to any subsequent reviewers the weight the [ALJ]

gave to the [claimant's] statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). No grounds for remand exist where "the evidence of record permits [a court] to glean the rationale for the ALJ's decision." *Monguer v. Heckler*, 722 F.3d 1033, 1040 (2d Cir. 1983).

Here, after considering all the evidence, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but did not credit her testimony regarding the intensity, persistence, and limiting effects of the symptoms to the extent they were inconsistent with RFC. Tr. 406. Based upon the specific reasons offered by the ALJ for his finding on credibility and the wealth of supportive evidence in the record, I conclude that the ALJ ably resolved the evidentiary conflicts and reasonably appraised the credibility of the witnesses. Although the ALJ did not mention the testimony of Plaintiff's friend Tammy Turnbull, with few exceptions, her testimony essentially mirrored that of Plaintiff.

Finding that Plaintiff had no past relevant work, and her ability to perform all or substantially all of the requirements of light work had been impeded by additional limitations, and in order to determine the extent to which such limitations "erode[d] the unskilled occupational base," the ALJ asked the testifying VE whether jobs existed in the national economy for a hypothetical claimant with Plaintiff's age, education, work experience, and residual functional capacity. Tr. 408. Based upon the VE's testimony that jobs, such as photocopy machine operator (33,865 jobs nationally), collator operator (44,148 jobs nationally), and laundry sorter (128,478 jobs nationally), existed in the national economy for an individual presenting with Plaintiff's factors, the ALJ concluded that Plaintiff was capable of making a successful adjustment to other work existing in significant numbers in the national economy and, consequently, a finding of disabled was not appropriate. Tr. 408-409. Therefore, for the reasons

set forth herein above, the Court rejects Plaintiff's arguments for reversal of the Commissioner's decision denying Plaintiff SSI because she was not disabled since June 22, 2005.

## IV.   **CONCLUSION**

For all of the foregoing reasons, and after careful consideration of the entire record, I find that the Commissioner's determination was supported by substantial evidence in the record and was not erroneous as a matter of law.   Accordingly, the Commissioner's determination is affirmed.   The Court hereby GRANTS Defendant's Motion for Judgment on the Pleadings (ECF No. 7) and DENIES Plaintiff's Cross-Motion for Judgment on the Pleadings (ECF No. 10).   The Court orders that Plaintiff's Complaint (ECF No. 1) be dismissed, and the Clerk of the Court is directed to close Civil Case No. 12-CV-6698.

IT IS SO ORDERED.

Dated: August 28, 2014
        Rochester, New York

HON. FRANK P. GERACI, JR.
United States District Judge